The first case for argument this morning is 19-1011 Halzyme v. Iancu. Mr. Gady? Gady, yes, Your Honor. Good morning. Good morning. May it please the Court. I'll get right to the chase here. The District Court committed clear errors of law, and I wish to focus on four of them. First, I'll focus primarily on the court legally erring by applying the doctrine of routine optimization to overcome the legal requirements of motivation to combine and reasonable expectation of success for obviousness and ODP. Specifically, there is no disclosed range of pegylation in the cited prior art for the specific haluronidase. And B, the Braxton and Thompson references that form the grounds for rejection for the claims only point to uncertainties and different techniques inapplicable to this particular pharmaceutical composition. Secondly, for ODP, the District Court compounded its errors by consulting and relying on the 431 and 081 reference patent specification and by finding that there is, in essence, a presumption that whether it's a broader genus claim, a species claim, cannot be patentable. Third, the District Court erred by finding and creating a rule of law that commercial success and long-felt need can never be shown for a product until it is approved by the FDA, creating a bright-line test that would undermine the enforceability of patents by life science companies in the United States. And then finally, the District Court, with respect to Bookbinder, errors by saying there's no beginning and end point in the amino acid sequences. I don't want to spend really any time on that. I just want to make one point on that briefly for the Court. The Court says there's no beginning and end point, but if you look at the decision at page 11, appendix 12, right there the Court says that the application discloses SeqID number 1, which identifies as the polypeptide sequence of human hyaluronidase, and SeqID number 4, which corresponds to amino acids 36 to 43 of SeqID number 1. So later on in the opinion, the Court says that the disclosure provides no beginning and end point, but is undermined not only by the record that is briefed here, but also by the very statement in its decision at page 11, that there is a beginning point. All the pending claims have 36 as their beginning point, and all except one claim have it as an end point, 43. So it's right there in the District Court's decision. Let's turn first, though, to what I think is the main issue here, which is the routine optimization that was used to overcome the legal requirements of a proper conclusion under obviousness for motivation to combine and reasonable expectation of success. There is no ratio here. There is no range that is provided here. PTO and the Court in their decision do not point to any language in the Braxton or the Thompson references that provide a specific range. Why is that important? That's important because it's the range in the Court's case law, such as in the Peterson case, which had 0 to 7 percent, that provide the framework for motivation and provide the framework for reasonable expectation of success in the Peterson claim that had 1 to 3 percent. We don't have that here. We have no guidance in Braxton as to a specific range that this Court has used. In the past, for example, in the Peterson case. Also, other ranges are not broadly applicable here. As was admitted by their expert, pegylation is, quote, specific to each protein, close quote. That's Appendix 7981 at line 6 to 8. So no broad applicable ranges can be transferred from one protein to another. Without the range, it's improper to, in essence, then use the doctrine of routine optimization because there's nothing in the art. And effectively, what the Court did was use hindsight bias by looking at the range in the claim of 3 to 6 and then saying, well, that one would get to with routine optimization. But how does one know that? There's no guidance in the art. There's no range in the art. There's nothing that guides one to a person of ordinary skill to that 3 to 6 solution. Your argument's about range. So what you're looking is a range, what, a larger range? There would have needed to be a larger range in the prior art and this would be a species of that? Is that what you're arguing for? Exactly. It has a range that provides the teaching that then one of skill can use routine optimization to get to the species within that range, such as in the Peterson case, where there is 0 to 7 percent versus what was ultimately found. Well, there might be cases where the range is included, but which of our cases say that's necessary in order to apply the optimization analysis? Well, I think it becomes to the point then it's necessary when you go to your other cases, such as in the Stepan case, where there wasn't a precise range that was provided. In fact, there the claim was at 70 degrees centigrade and there's a suggestion in the Stepan case up to 65 degrees centigrade. And the court found in that case that there was no guidance as to the why to go to the 70 degrees centigrade. So that's an example right there in the Stepan case. I think also you could look to the Genetics Institute case, where there were multiple different species within the scope of the genus claim, just as there are here. And there again... Well, it seems to me we have a number of cases and the test they rely on is whether or not there's just an enormous number of variables to choose from. Yes. That's not the argument you're making here. You're not saying the range is so enormous that it would have taken more than routine optimization to select the three to six range. Well, I'm making a couple of different points, Your Honor. The range here is... First of all, there is no range, so we're not limiting down the number of potential embodiments by the prior art range. Secondly, left with the fact that you just have the general guidance in the reference claims of a pegylated or dextran modified hyaluronidase, but no range within that. Then within that, given the number of amino acids within hyaluronidase, there are a multitude of potential different structures. And importantly, Your Honor, it's not just that you can attach a peg. It's that you will have in this claim for this pharmaceutical composition, a hyaluronidase that is pegylated that has activity systemically, that is formulated for systemic administration. That's the purpose and that's the property that specific hyaluronidase must have. It must have that property. And among all the multitudes and the myriad of different possibilities that exist, there's nothing that guides one of ordinary skill in the art through a range where the routine optimization could apply. I think then, secondly, when we're looking at the range, then I think that brings us to the second fundamental error. So to find the motivation and to find the reasonable expectation of success, the court relies on the Braxton and the Thompson references. And it's clear that you can't just cherry pick words in a reference for the combination for obviousness. That was held in the Bausch and Lomb case that's cited in our briefs. And what did the district court do? It relied on one sentence in the background of the invention and it ignored the entire thrust of the references themselves, which was undisputed. They relate to a technique that if used, one skill would understand, would destroy the activity of the hyaluronidase, clearly teaching away. More importantly, even in the background section that the court relies upon, there are two key points in there as well. First, it says that if you use sort of random lysine modification, which is an approach, it's not suitable for pharmaceutical compositions. And that's at 101, 143, 32 through 34. And also in Braxton in the background section, it says it is, quote, unsuitable where certain lysine residues are essential for biological activity. That's at lines column two, lines 62 to 65 in Braxton. So two warning points are in Braxton. First, it's not suitable to use random lysine pegylation for pharmaceutical compositions, which is a limitation of the claim. Second, it's unsuitable where certain lysine residues are essential for biological activity. And those were clear unknowns in the art as to what specific amino acids, what specific lysines would in fact, if pegylated, have an impact on the activity. And the ODP claims, the reference claims, where they just talk about dextran or pegylated modified hyaluronidase, don't provide that specific teaching necessary for the systemic use where you have all the clearance mechanisms of the body in play. And secondly, don't point you in any way that is suitable for a pharmaceutical composition, which Braxton clearly warns against. And then Braxton says, go to another technique, which one of ordinary skill in the art understands, would be inapplicable. So there's no clear guidance or direction within Braxton and Thompson pointing the person of ordinary skill in the art towards the invention, which is three to six pegs that is formulated for systemic application. And by relying on the single sentence in the background to the invention, the court erred and cherry-picked in violation of the Bausch and Lomb case that is cited in our briefs at 796 Fed 2nd 448. And otherwise, the doctrine of teaching away is undermined. If you can find the motivation or the reasonable expectation of success in a single sentence in the background to an invention, which in fact disparages the very technique, now the doctrine of teaching away of the reference, which must be considered as a whole, is undermined. Because the references, undisputably, as a whole, there's no doubt about it, teach a technique that if used would destroy the activity. It would not be suitable. The other FDA-approved drugs that the PTO points to do not help them because there is no range pointing to three to six. Most of them are monopegylated, which doesn't point to three to six. The one that they rely on, Atigen, which is 11 to 17, isn't the range. And also, in one of the other FDA-approved drugs, it actually talks about pegylating the histidine, which is different. So there are multiple different ways that these products can be pegylated. It is specific to each and every one, and it's not transferable from one to the other. And just simply stating that there is a reference claim to modifying pyloronidase by pegylation or dextran doesn't get you, through Braxton and Thompson, to the clear invention here, which is to develop a new drug that would be used for systemic use, never before application, that had been identified, and that there's no clear guiding or teaching in the art around it. You're into your rebuttal time. I'll reserve the rest. Thank you. May it please the court, for Halazine to prevail, it must establish that all four of the board's rejections were in error. The correct starting point for the board's rejections is not an unpegylated pyloronidase. It's a pegylated pyloronidase, which is claimed by each of the reference patents and disclosed by Bookbinder. Using these starting points, the board did, using these correct starting points, the district court did find motivation to optimize in a reasonable expectation of success. In fact, isn't it the case that Bookbinder is only missing the three to six? Nothing else. Everything is there, so I don't know how to say all those words. Lysine, pegylation, it's all disclosed in there, right? Everything is in there. Right. Okay. But the rain, I mean, your friend, you heard him, and he made the same argument in his briefs, that routine optimization does not get you there. There's just no range disclosed in the prior art, and so this isn't initially a case where you can apply routine optimization. Well, actually, there is a range disclosed in the prior art, because a person of ordinary skill knew that there were only 31 lysines. So the largest number that could be pegylated was 31, and all of the experts explained that a person of ordinary skill in the art knew how to pegylate. They knew how to attach pegs. They knew how to figure out how many pegs were there, and so it would just be narrowing the 31 possible sites down to what Halizine says is a weighted average to about 3 to 6. So there is a range there. I do want to mention something about the formulated for systemic administration, because Halizine talks about that a lot. That claim term is actually just redundant of the other claim terms in the claims. The only evidence Halizine presented on why formulated for systemic administration is a patentable distinction was Dr. Flammion saying that the term is important because it must have the properties to be injected as a systemic administration, and that was at 7719. And he explained that those properties are twofold, solubility and a relatively long half-life. That's at 7683. Both of those properties are already achieved by modification of the protein. Solubility is achieved by truncation, and the long half-life is achieved by pegylation. So the claims of all of the ODP reference patents already claim a truncated, pegylated hyaluronidase, so they are already formulated for systemic administration. You moved away, though, from the argument that he spent the bulk of his time on, and you really didn't respond in any significant way to the 3 to 6 limitation. Even if a skilled artisan would know there are only 31 choices, how do you get from 31 to 3 to 6? What's the evidence? So the evidence is that a person of ordinary skill knew how to do so, right? Nectar, salts, pegylation reagents. Halazime's own expert said a person would make a pegylated hyaluronidase, test it for activity and longevity, and if the result didn't meet your desired criteria, you could vary the degrees of pegylation. That's at 7853. That's Dr. Zalewski. Their other expert, Dr. Flammion, said that if you have no effect on half-life with one peg, your natural response would be to put on 3, 4, or 5 pegs until you have some effect. That's at 7742. So a person of ordinary skill knew what the variables were, knew how to pegylate, and would simply put pegs on, test it for activity and longevity, and if the result didn't meet your desired criteria, you would vary the degrees of pegylation. Halazime's argument, moving on to Bookbinder. Varying the degrees, though, I mean, how many choices is it? It's not 31 choices, right? But it's infinitely more than that. So they make an argument that there's a million variants, but that's incorrect because the claims don't require pegylation at any particular points. All they require is about 3 to 6 pegs. Halazime actually says it's a weighted average of about 3 to 6 pegs. So some of the proteins could actually have 8 pegs, some of the proteins could have 1. So it's actually quite a long range. And our expert, Dr. Joe, said that that would be easy for a person of ordinary skill to achieve, and there was no rebuttal testimony to that. It would be easy why and how? It would be easy because you only have 31 possible choices, and a person would know, like I said, what the variables are. One of the variables is pH. One of the variables is the concentration of pegs per protein. So you would just put that on. You would test it. And as Dr. Fleming said, if you didn't see an increase in half-life, you would add more pegs. And you could do that by changing the pH or changing the concentration until you got to the range where it was the optimal balance. A person of ordinary skill knew that pegylation increased half-life, decreased activity, and they would be motivated to find that optimal point. What about your friend's argument with respect to the other – I guess it was the Thompson reference in that it taught away and he kept using the word cherry-picking in terms of one sentence from the background. Right. So, first of all, their teaching away argument is actually asking – it's actually ignoring the primary reference, which is bookbinder, which already teaches to use lysine pegylation. What they're asking the court to do and what they asked the district court to do was ignore bookbinder, pretend bookbinder doesn't exist, and pretend you have an unpegylated hyaluronidase and only Braxton and Thompson in hand. And then would you choose lysine pegylation? But the starting point is already, with bookbinder, a pegylated hyaluronidase with lysine. But even if we were to go down that road and figure out whether Braxton and Thompson teach away from lysine pegylation, they don't. Palazime is the one that's cherry-picking the one sentence which says, such mixtures of diversely modified proteins are not suitable as pharmaceutical compositions. Diversely modified proteins means lysine pegylated. But the very next sentence, Braxton tells you how to solve that. He tells you to use purification and characterization. And Dr. Joe testified that both of those techniques had improved tremendously since Braxton was filed in 1995. The other thing is Braxton is self-contradictory when it says these mixtures are not suitable as pharmaceutical compositions because the example Braxton is using is adesine deaminase, which is adegine, which actually was approved by the FDA as a lysine pegylated pharmaceutical composition. And Palazime's own expert, Dr. Zalipsky, admitted that and said it was ironic. Let me just ask you about the play in this case because you've got at least two separate ways to go here, on a 103 straightforward obviousness and then on a double patenting. Is there any reason for us to decide on both of those grounds or to pick one or another? Are there any consequences to how we decide to resolve this case if we are interested in affirming it? So if you were, since all the claims were rejected under all four rejections, if you affirm any one of them, that will end this dispute. In other words, Palazime has to show error. And there's no consequence, no other pending cases or things or reason to resolve a double patenting issue on these claims or anything like that? Not that I know of. I think Palazime also made the argument about the ODP rejection that the district court looked at the specification of the reference patents, but that was an alternative. So if this court were to affirm the district court's analysis without looking at the specifications of the 431 and 081 patents, it would not even have to look at that legal issue. Going back to the first argument, and he did raise this point about under the 103 rejection, the prior, whether the prior art, the board rejected it as not having not sufficient written description because it had no starting point. Right. You know what I'm talking about. And he's arguing that there is a starting point. And he referred to us to a page in the board's opinion where the board itself acknowledged that. So could you respond to that? Sure. So it was there. They were trying to show priority to the 171 application at the district court. So it was their burden to show written description. This is actually a new argument that their expert didn't make. Their expert at trial only relied on paragraph 39 of the 171 application. The district court did not let them, did not let the expert rely on another paragraph, paragraph 704, because it had not been disclosed during discovery. Hal is now trying to rely on 704 again, even though the district court didn't let their expert rely on it. And they're actually raised two additional paragraphs for the first time in their appeal brief that they're trying to rely on, paragraphs 114 and 44. And now they're trying to rely on sequence ID number four. So all those arguments are waived. Their expert had every opportunity to rely on them at trial in their expert reports and did not. But my recollection is, what about, he pointed us to appendix 11 at the start of his argument. I think it was appendix 11 of the board's opinion. I'm sorry, it's the district court's opinion. Yeah, it's actually appendix 12. So that does say that seek ID number four corresponds to those amino acids. But first of all, the claims aren't limited to just 36 to 483. They have other starting points. And second of all, their expert never relied on seek ID number four. He generally pointed and said there are 30 pages of sequences, there are 53 sequences in there somewhere. But he did not point to seek ID number four to support this. If there's nothing further, I'll yield the rest of my time. Thank you. Just very briefly, Your Honor. First, with respect to the routine optimization, it also includes the requirement formulated for systemic activity to have activity. It's not just half-life. It also has to have activity in the systemic context. That was unknown. Second, turning to bookbinder, as we've argued, bookbinder, of course, is not prior art. So relying specifically upon disclosure in bookbinder is part of the obviousness that the PTO does is improper because bookbinder itself does not qualify as prior art because it relates back. The 171 application relates back to the 716 application, and therefore bookbinder is not prior art. So the contents of bookbinder should not be properly considered as part of the obviousness. Finally, with respect to bookbinder itself again, one PTO points out that we didn't raise a specific point about seek ID number four that the court's opinion relies upon at page 11, but, of course, we didn't have the court's opinion at trial. This is what came out afterwards. This shows the contradictory nature of the clear evidence that was before the court. The beginning and the end points were all disclosed in the application that was in evidence, and the court said there's no beginning and end point, and that is completely contradicted by its earlier point in its decision at page 11. Thank you. Thank you. We thank both sides in the cases submitted.